**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

ED PARISH, JR., as Personal Representative
of the Estate of BILLY MATTHEW SMITH,

               Plaintiff,

v.

JEFFERSON DUNN,
GRANTT CULLIVER,
JOSEPH HEADLEY,
KENNY WAVER, and
JEREMY A. SINGLETON

               Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 2:19-CW-878

**JURY TRIAL DEMANDED**

## COMPLAINT

COMES NOW Plaintiff Ed Parish, Jr., as personal representative of the Estate of Billy Matthew Smith (the "Plaintiff"), and respectfully files this Complaint and alleges the following:

## INTRODUCTION

1.     At twenty-nine (29) years old, Billy Matthew Smith ("Mr. Smith") entered the custody of the Alabama Department of Corrections ("ADOC") and, tragically, was released from prison to a funeral home rather than to his family and his freedom following the end of his sentence. Although he was not sentenced to death by an Alabama court, his sentence to the custody of the ADOC for a period of incarceration was tantamount to a death sentence.

2.     On or about November 13, 2017, at Elmore Correctional Facility, a prisoner, Bryan A. Blount, punched Mr. Smith in the head causing him to fall and hit his head on the floor.

3.     Later, on that same day, Defendant Jeremy A. Singleton, a correctional officer, violently and excessively struck Mr. Smith, who was already injured, multiple times about his head and face and kicked Mr. Smith's feet out from under him causing Mr. Smith to fall on the ground.   Defendant Singleton then failed to seek timely medical attention for Mr. Smith following these rounds of violence.

4.     Mr. Smith suffered serious injuries as a result of these attacks including but not limited to a significant traumatic brain injury.   Those serious injuries ultimately proved to be fatal, and Mr. Smith died on or about December 9, 2017, as a result of the injuries inflicted upon him at the hands of a fellow prisoner and an ADOC employee.

5.     Both Bryan A. Blount and Defendant Jeremy A. Singleton have been charged by the State of Alabama with manslaughter for their misconduct in causing the death of Mr. Smith.

6.     For several years, up to and including the date of Mr. Smith's death, pervasive violence including prisoner on prisoner assaults and excessive force by correctional officers plagued Elmore Correctional Facility.

7.     Prior to his death, statewide officials within the ADOC, including Defendants Jefferson Dunn and Grantt Culliver, were aware of the violence that plagued Elmore Correctional Facility and the ADOC officials assigned to Elmore Correctional Facility, including Defendants Joseph Headley and Kenny Waver, were aware the facility they directly administered was beset by violence on an ongoing basis.

8.     Around the time of Mr. Smith's death, the ADOC was experiencing the highest prison homicide rates in the nation.

9.     The ADOC, by its own account, maintained grossly overcrowded and understaffed prisons, including Elmore Correctional Facility, at the time of Mr. Smith's death.

10.    Mr. Smith is survived by his three (3) minor children.

## JURISDICTION AND VENUE

11.    This Honorable Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).  Several claims herein arise under the Constitution, laws, or treaties of the United States.

12.    The Court has supplemental jurisdiction over the pendent state law claim pursuant to 28 U.S.C. § 1367(a).

13.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims presented in this case occurred in the Middle District of Alabama.

## PARTIES

14.    Plaintiff Ed Parish, Jr. (the "Plaintiff") is the duly appointed personal representative of the Estate of Billy Matthew Smith, *see In re: The Estate of Billy Matthew Smith*, In the Probate Court for Marshall County, Alabama, Case No.: 18-125,  and brings this action pursuant to 42 U.S.C. § 1983 and Alabama Code § 6-5-410.  The Plaintiff is seeking damages on behalf of Mr. Smith's heirs as the representative of his estate to remedy the violations of Mr. Smith's rights secured by the United States Constitution and the laws of the state of Alabama, to punish the Defendants for their wrongdoing, and to deter similar wrongful conduct from occurring in the future.  The Plaintiff is a citizen of Alabama and over the age of nineteen (19) years old.  The decedent, Mr. Smith, was originally from Arab, Alabama, and is survived by his mother, his two (2) sisters, and his (3) children.  He was thirty-five (35) years old at the time of his death.

3

15.     Defendant Jefferson Dunn ("Dunn" or "Defendant Dunn") is a citizen of Alabama and over the age of nineteen (19) years old.  Defendant Dunn was the Commissioner of the ADOC at the time Mr. Smith was assaulted on or about November 13, 2017.  In April 2015, Defendant Dunn was appointed the Commissioner of the ADOC.  Defendant Dunn is responsible for exercising the authority, functions, and duties of the Commissioner of the ADOC including the appointment of personnel and employees within the ADOC required for the performance of the ADOC's duties towards the prisoners it incarcerates.  Those duties include operating a prison system that respects the constitutional and human rights of persons within the custody of the ADOC, including the rights belonging to Mr. Smith while he was a prisoner at Elmore Correctional Facility.  Defendant Dunn is sued in his individual capacity.

16.     Defendant Grantt Culliver ("Culliver" or "Defendant Culliver") is a citizen of Alabama and over the age of nineteen (19) years old.  At the time Mr. Smith was assaulted at Elmore Correctional Facility, Defendant Culliver was the Associate Commissioner of Operations for the ADOC.  He was responsible for overseeing the daily operations at the ADOC's correctional facilities housing men including Elmore Correctional Facility where Mr. Smith was housed in November 2017.  Defendant Culliver is sued in his individual capacity.

17.     Defendant Joseph Headley ("Headley" or "Defendant Headley") is a citizen of Alabama and over the age of nineteen (19) years old.  Defendant Headley was the Warden of Elmore Correctional Facility at the time Mr. Smith was assaulted there on or about November 13, 2017.  As Warden, Defendant Headley was responsible for the operation of Elmore Correctional Facility.  Defendant Headley is sued in his individual capacity.

18.     Defendant Kenny Waver ("Waver" or "Defendant Waver") is a citizen of Alabama over the age of nineteen (19) years old.  Defendant Waver was a correctional officer

4

with the rank of Lieutenant who was working as the shift commander at Elmore Correctional Facility at the time Mr. Smith was assaulted there on or about November 13, 2017. Defendant Waver was a supervisor to Defendant Jeremy A. Singleton and on duty at the time Defendant Singleton assaulted Mr. Smith and then ignored Mr. Smith's life-threatening medical needs. Defendant Waver is sued in his individual capacity.

19.     Defendant Jeremy A. Singleton ("Singleton" or "Defendant Singleton") is a citizen of Alabama and over the age of nineteen (19) years old. Defendant Singleton was a correctional officer employed by the ADOC when he assaulted Mr. Smith at Elmore Correctional Facility on or about November 13, 2017, and later ignored Mr. Smith's life-threatening medical needs that resulted from the violence he suffered at Elmore Correctional Facility on November 13, 2017, caused by Defendant Singleton and other assailant(s). Defendant Singleton is sued in his individual capacity.

## ALLEGATIONS

### I.     OVERCROWDING, UNDERSTAFFING, AND VIOLENCE THROUGHOUT ADOC FACILITIES

20.     The United States Constitution guarantees that all persons within the custody of the ADOC have a right to be housed in safe conditions and not be subjected to violence.

21.     Despite these constitutional protections, Alabama's prisoners are subject to the nation's highest prison homicide rate while incarcerated in ADOC prisons.

22.     For years, understaffing has been a persistent, systemic problem that leaves many ADOC facilities including Elmore Correctional Facility incredibly dangerous and out of control.

23.     A spokesperson for the ADOC has observed: "There is a direct correlation between the level of prison violence and the shortage of correctional staff in an overpopulated prison system with limited resources for rehabilitating offenders[.]"

5

24.     ADOC prisons, including the Elmore Correctional Facility where Mr. Smith was housed, have been systemically overcrowded and understaffed for years creating an unsafe and extremely dangerous environment for the prisoners in ADOC custody.  Defendants Dunn, Culliver, and Headley were aware of the understaffing issues within the Elmore Correctional Facility specifically and know the excessive amount of violence within the ADOC prisons generally that has resulted from understaffing.

25.     The ADOC's ongoing constitutional violations have been severe, inherent, and compounded by deficiencies in staffing and supervision; overcrowding; inadequate incident reporting; ineffective prison management and training; and include a historically excessive amount of violence at Elmore Correctional Facility specifically and within ADOC prisons generally.  In fact, Defendant Dunn has admitted violence within the ADOC was so pervasive that it was essentially the "norm."

26.     At the end of 2015, it was reported that Defendant Dunn acknowledged that the ADOC would face violent consequences from prison overcrowding and understaffing.

27.     Between September of 2015 and September 2016, the number of correctional officers assigned to the ADOC's prisons declined twenty percent (20%).

28.     In October of 2016, only 53% of the correctional officer positions within the ADOC were filled.  ADOC spokesperson Bob Horton spoke to the understaffing stating, "[t]he Alabama Department of Corrections has a critical shortage of corrections officers...Since 2012, the number of DOC officers has dropped by 20 percent and the rate of violent incidents has increased exponentially."

29.     On October 6, 2016, the United States Department of Justice ("DOJ") put Defendants Dunn, Culliver, and Headley on notice that it had opened a Civil Rights of

6

Institutionalized Persons Act ("CRIPA") investigation into Alabama's male prisons, including Elmore Correctional Facility.

30.    In 2016, there were 2,111 reported occasions of prisoner-on-prisoner violence in Alabama prisons. This marked an eighteen percent (18%) increase from 2015. Incidents of prisoner-on-prisoner violence that caused serious injuries increased by approximately sixty-five percent (65%) in 2016.

31.    During the fiscal year 2017, ADOC publicly reported nine (9) homicides in its men's prisons. This staggering and tragic death toll equates to a homicide rate of fifty-six (56) per 100,000 prisoners.

32.    For Fiscal Year 2017, the ADOC publicly reported "critical levels of authorized staffing shortages."

33.    In its 2017 Annual Report, the Alabama Department of Corrections lists "To ensure safe, humane and constitutional conditions of incarceration in all facilities[,]" including Elmore Correctional Facility, as one of its Department Priorities.

34.    Despite these professed values in its own policy statements and prior acknowledgement of forthcoming, violent consequences due to overcrowding and understaffing, violence has continued unabated for years within the ADOC during the time of Mr. Smith's incarceration while correctional officer staffing levels were simultaneously declining and overcrowding was pervasive throughout ADOC prisons, including consistently high overcrowding rates at Elmore Correctional Facility.

35.    According to the ADOC's public monthly reports, between January 2015 and December 2017, twenty (20) prisoner deaths occurred as a result of homicide. However, the

actual number of homicides is necessarily higher because Mr. Smith's death was not included in the ADOC monthly reports.

36. In June of 2017, the United States District Court for the Middle District of Alabama found that "ADOC facilities are significantly and chronically overcrowded." *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1193 (M.D. Ala. 2017). The court's findings pertained to, in part, a time period inclusive of the time Mr. Smith was imprisoned at the Elmore Correctional Facility.

37. Defendant Dunn himself, in sworn testimony in the United States District Court for the Middle District of Alabama "aptly described the prison system as wrestling with a 'two-headed monster': overcrowding and understaffing." *Braggs*, 257 F. Supp. 3d at 1184.

38. The district court in the Middle District of Alabama has noted that, "Understaffing has been a persistent, systemic problem that leaves many ADOC facilities incredibly dangerous and out of control….[A] severe shortage of officers leads to dangerous and violent conditions, especially in high-security facilities with overcrowded dormitories." *Braggs*, 257 F. Supp. 3d at 1198.

39. In June 2017, the United States District Court for the Middle District of Alabama found that "[t]he combination of overcrowding and understaffing leads to an increased level of violence, both because of the difficulty of diffusing tension and violence in an overcrowded open-dormitory setting, and because of the lack of supervision by correctional officers." *Braggs*, 257 F. Supp. 3d at 1200.

40. From January 1, 2017, to July 26, 2017, thirteen (13) prisoners were assaulted and killed in Alabama prisons.

41. By the end of 2017, the year of Mr. Smith's death, ADOC's workforce had been in decline for eight (8) years.

8

42.     The DOJ wrote Alabama Gov. Kay Ivey on April 2, 2019, stating that in the course of its nearly two and a half year investigation it "had reasonable cause to believe that Alabama routinely violates the constitutional rights of prisoners housed in Alabama's prisons by failing to protect them from prisoner-on-prisoner violence...and by failing to provide safe conditions."

43.     Although Defendants Dunn and Culliver were well aware of a history of widespread violence throughout the ADOC's prisons housing men, the connection between violence and the ADOC's chronic problems with overcrowding and understaffing, neither Defendant Dunn nor Defendant Culliver took meaningful steps, through custom or policy, in 2015, 2016, or 2017 to significantly alter the numbers in ADOC's prisons which continued to show too many prisoners and not enough correctional officers.  Thus, the recipe for violence in ADOC prisons was passed down year after year after year.

44.     This perpetuation of violence in ADOC prisons was further exacerbated by a chilling effect that ADOC's culture of silence has on reporting internal misconduct.   For example, ADOC's Investigations and Intelligence division personnel have previously admitted that they lack the necessary autonomy and support to expose and prosecute staff misconduct. Some ADOC personnel have expressed fear of reprisals and termination if they identify inappropriate behavior by correctional officers or administrative staff.

## II.     OVERCROWDING, UNDERSTAFFING, AND VIOLENCE AT ELMORE CORRECTIONAL FACILITY

45.     Elmore Correctional Facility originally was built in 1981.  It is a medium custody facility.

46.     The design capacity for Elmore Correctional Facility is approximately 600 prisoners. In the month Mr. Smith was fatally wounded at Elmore Correctional Facility, the prison's census was 1,119 which is 186.5% of its design capacity.

47.     In July 2013, the Equal Justice Initiative complained to the Alabama Department of Corrections of widespread physical abuse and other misconduct at Elmore Correctional Facility.

48.     The Alabama Department of Corrections began its own investigation in July 2013, into as many as ten (10) incidences of correctional officers using violent force against prisoners at Elmore Correctional Facility.

49.     Later that year, in October 2013, Derrick Denis was stabbed to death by another prisoner at Elmore Correctional Facility.

50.     Eight (8) prisoners were sent to Jackson Hospital in Montgomery, Alabama (three (3) were admitted for treatment) in March 2014, following prisoner on prisoner violence in the course of a riot in one of Elmore Correctional Facility's dormitories.

51.     That same year, Correctional Officer Jeremy Walker assaulted a handcuffed prisoner at Elmore Correctional Facility in July 2014, and pled guilty to his criminal assault in May 2017, in the United States District Court for the Middle District of Alabama.

52.     In November 2014, the Equal Justice Initiative publicly issued findings of "widespread abuse and corruption" in Alabama's prisons. Correctional officers were reportedly smuggling in contraband items creating a black market that stimulated violence in Alabama's prisons. Correctional officers and administrators at Elmore Correctional Facility were alleged to be involved in "prolonged patterns of violence."

53.    Although Elmore Correctional Facility is a medium custody prison, by 2015, violent offenders totaled roughly fifty percent (50%) of its population.

54.    By 2015, nearly 400 prisoners were held in each dorm at Elmore Correctional Facility, and bunk beds were being used to detain such a large population in a constricted area.

55.    Leon Forniss, the Warden at Elmore Correctional Facility back in 2015, explained that outfitting dormitories at the prison with bunk beds was unsafe.  The use of bunk beds prevented correctional officers from properly supervising the dormitories because of poor sightlines.  Typically, there were only two (2) correctional officers supervising dormitories housing 392 prisoners.

56.    In 2015, Elmore Correctional Facility was understaffed by approximately fifty percent (50%), and there was typically only one correctional officer for every fifty-nine (59) prisoners.

57.    Because prisoners at Elmore Correctional Facility are often double-bunked, the correctional officers' lines of sight inside the dormitories are limited, and this combination can lead to a higher risk of violent activity.

58.    Instances of brutality by correctional officers and violence within the ADOC and the Elmore Correctional Facility have been well documented.

59.    The pervasive culture of violence at Elmore Correctional Facility was widely known throughout the ADOC prior to Mr. Smith's death and Defendants Dunn, Culliver, and Headley knew that prisoners were at substantial risk of serious harm due to violence perpetrated both by other prisoners and correctional officers.

60.     In addition to the overcrowding and understaffing, the violence at Elmore Correctional Facility perpetuates year after year because its correctional officers continue to lack training and supervision needed to turn the tide of unrelenting violence inside prison walls.

61.     On February 8, 2015, a prisoner was stabbed and killed at Elmore Correctional Facility.

62.     Another prisoner was stabbed and killed at Elmore Correctional Facility on March 25, 2016.

63.     A snapshot from almost any month at Elmore Correctional Facility, in the months leading up to Mr. Smith's injury and death, indicates serious levels of violence. For example, in August of 2016, Elmore Correctional Facility recorded thirteen (13) assaults for a total of seventy-two (72) at the facility eight (8) months into the year.

64.     In an eighteen (18) month window from February 2015 through August 2016, there were three (3) prisoner homicides at Elmore Correctional Facility.

65.     In 2016, Defendant Dunn explained, "The systemic issues throughout the department directly correlate to serious overcrowding, understaffing, and outdated facilities...Elmore Correctional Facility is just one example of what the entire system faces."

66.     Even after these unnecessary deaths, in September 2016, Elmore Correctional Facility still housed 1,186 prisoners in a facility designed to hold 600 prisoners exceeding design capacity by 198%.

67.     In 2017, the Elmore Correctional Facility did not even employ half of the correctional officers that it was allowed to hire.

12

68. On February 16, 2017, a prisoner was found unresponsive in his cell at Elmore Correctional Facility after he had been badly beaten and died as a result of his injuries. The ADOC investigated his death as a homicide.

69. That same day another prisoner was stabbed and killed at Elmore Correctional Facility.

70. Ten (10) days later on February 26, 2017, a prisoner was stabbed and killed at Elmore Correctional Facility.

71. In May of 2017, a correctional officer pled guilty to assaulting a prisoner at Elmore Correctional Facility.

72. In June 2017, the Alabama Department of Corrections revealed the Correctional Officer staffing level for Elmore Correctional Facility was only at 42.9%.

73. Again on July 25, 2017, another prisoner was stabbed and killed.

74. In 2017 due to safety concerns related to a stabbing, Defendant Dunn said "critical staffing may be needed." Defendant Dunn also promised that, "[w]e will employ all available resources to prevent the escalation of violence in light of recent incidents."

75. Despite this assertion in response to safety concerns, Defendants Dunn and Culliver failed to lessen the risk of violence within the ADOC facilities as the number of reported incidents of prisoner-on-prisoner violent incidents continued to increase.

76. In September 2017, a prisoner was beaten and injured at Elmore Correctional Facility.

77. In November of 2017, Elmore Correctional Facility was holding 1,119 prisoners, and its population was at 186.5% of design capacity.

78.     In just the month of November of 2017, there were twenty-seven (27) assaults at Elmore Correctional Facility, and six (6) of these assaults led to a serious injury.  Furthermore, there were sixteen (16) fights among prisoners in November of 2017.

79.     In December of 2017, Elmore Correctional Facility housed 1,131 prisoners for a census of 188.5% of design capacity.

80.     At the time of Mr. Smith's death in December 2017, the ADOC only filled fifty-eight (58) of 157 recommended correctional officer positions at Elmore Correctional Facility which equates to a correctional officer staffing level of 36.9% of recommended positions.

81.     Defendants Dunn and Culliver were aware of the significant, accelerated, and unprecedented decline in correctional officers assigned to ADOC prisons and the substantial risk of violence that the conditions within Elmore Correctional Facility and other mens' prisons within the ADOC.

82.     Defendant Headley had direct knowledge of overcrowding, correctional understaffing, and ongoing violence and threats of violence toward prisoners and correctional officers at Elmore Correctional Facility in the months leading up to Mr. Smith's death.  Despite his knowledge of substantial risks of serious harm to prisoners at Elmore Correctional Facility, Defendant Headley failed to act to prevent prisoners at Elmore Correctional Facility, including Mr. Smith, from suffering serious injury and untimely death.

### III.     MR. SMITH'S INJURIES AT ELMORE CORRECTIONAL FACILITY AND RESULTING DEATH

83.     As of 2017, and in the days and months leading up to the assault he suffered in November of that year, Mr. Smith was incarcerated in the ADOC system at Elmore Correctional Facility.

14

84. Prior to November 13, 2017, Defendants Dunn, Culliver, Headley and Waver, as alleged *supra*, had long been aware of overcrowding, understaffing, and violence at Elmore Correctional Facility and had failed to take reasonable steps to address those issues in the days and months leading up to the time Mr. Smith was injured through an assault by a fellow prisoner, Bryan A. Blount, and the subsequent excessive force and violence perpetrated by Defendant Singleton at Elmore Correctional Facility.

85. Mr. Smith's confinement within a prison where violence and terror reigned created a substantial risk of serious harm to him.

86. On or about November 13, 2017, Mr. Smith was found conscious but lying in a dormitory bathroom with noticeable swelling on his forehead.

87. Initially, Mr. Smith was injured by fellow prisoner Bryan A. Blount who had punched Mr. Smith in the head causing him to fall and hit his head on the concrete floor.

88. Bryan A. Blount has since been indicted by an Elmore County grand jury for manslaughter for recklessly causing the death of Mr. Smith. *See Ala. v. Blount*, In the Circuit Court for Elmore County, Case Nos. CC-19-420 & CC-19-581.

89. Instead of being directly routed to necessary medical care, Mr. Smith was instead transported to an area near the shift office within the Elmore Correctional Facility. Defendants Waver and Singleton were present at the shift office when Mr. Smith was brought there.

90. While he was near the shift office area, Mr. Smith's wrists and legs were in restraints and Defendant Singleton attacked Mr. Smith striking him multiple times about his head and face and kicking his feet out from under him causing him to fall to the ground.

91. Both Defendant Waver and Defendant Singleton were aware that Mr. Smith had sustained serious injuries caused by another prisoner and Defendant Singleton and that Mr.

15

Smith obviously required immediate medical care, yet both failed to seek medical attention for Mr. Smith for an extended period of time.

92.     After the significant delay in obtaining medically necessary treatment for Mr. Smith which exacerbated or worsened the serious injuries he sustained, Mr. Smith eventually was taken to Jackson Hospital in Montgomery, Alabama on or about November 14, 2017.

93.     He received treatment for his serious injuries at Jackson Hospital from approximately November 14, 2017 to December 9, 2017.

94.     On or about December 9, 2017, Mr. Smith died as a result of the blunt force trauma he sustained during the November 13, 2017, assaults at Elmore Correctional Facility.

95.     Defendant Singleton has since been indicted by an Elmore County grand jury for manslaughter for recklessly causing the death of Mr. Smith. *See Ala. v. Singleton*, In the Circuit Court for Elmore County, Case No. CC-19-690.

96.     Defendants Dunn, Culliver, and Headley failed to take reasonable measures including to adequately staff Elmore Correctional Facility to provide for the safety of Mr. Smith and to prevent extreme violence at the hands of another prisoner and correctional staff within the Elmore Correctional Facility that ultimately cost Mr. Smith his life. The deliberate indifference of Defendants Dunn, Culliver, and Headley to Mr. Smith's constitutional rights exposed him to a substantial risk of serious harm to his health and safety that ultimately cost him his life.

97.     Defendants Dunn, Culliver, Headley, and Waver violated the Eighth Amendment rights of Mr. Smith when he was housed at Elmore Correctional Facility by failing to protect him from violence and by failing to provide a safe environment.

98.     Defendant Dunn had been briefed about overcrowding, correctional understaffing, and ongoing violence and threats of violence toward prisoners and correctional officers at

Elmore Correctional Facility in the months leading up to Mr. Smith's death. Despite his knowledge of substantial risks of serious harm to prisoners at Elmore Correctional Facility, Defendant Dunn failed to act to prevent prisoners at Elmore Correctional Facility, including Mr. Smith, from suffering serious injury and death.

99.     Defendant Culliver had been briefed about overcrowding, correctional understaffing, and ongoing violence and threats of violence toward prisoners and correctional officers at Elmore Correctional Facility in the months leading up to Mr. Smith's death. Despite his knowledge of substantial risks of serious harm to prisoners at Elmore Correctional Facility, Defendant Culliver failed to act to prevent prisoners at Elmore Correctional Facility, including Mr. Smith, from suffering serious injury and death.

100.     Prior to the injuries he sustained and his untimely death, Mr. Smith reported to his mother his concerns about his own safety and the safety of other prisoners at Elmore Correctional Facility.   His concerns included his grave fear of violence perpetrated by correctional officers against prisoners at Elmore Correctional Facility.

101.     The Defendants knew Mr. Smith was at risk to be hurt or killed due to the unsafe conditions and violence at Elmore Correctional Facility.

102.     ADOC did not report Mr. Smith's death in its December 2017 Monthly Statistical Report. ADOC reported that there were no "inmate-on-inmate homicides" in December of 2017.

103.     As of the date of this filing, no personnel from the Alabama Department of Corrections has expressed sympathy to Mr. Smith's family on the loss of their loved one or explained the circumstances surrounding his injury and death.

## **ATTORNEYS' FEES**

17

104.    In order to prosecute the causes of action alleged herein, the Plaintiff retained the undersigned attorneys to litigate the claims in this case. The Plaintiff is entitled to recover reasonable attorneys' fees and costs. *See* 42 U.S.C. § 1988.

## CAUSES OF ACTION

### COUNT ONE
**Violation of the Eighth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983**
**Excessive Force**
**(Against Defendant Singleton)**

105.    The Plaintiff adopts and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

106.    Defendant Singleton's violent, physical assault of Mr. Smith was unconstitutional cruel and unusual punishment under the Eighth and Fourteenth Amendments, and he was acting under color of state law.

107.    The Eighth Amendment of the United States Constitution prohibits cruel and unusual punishment, and the Fourteenth Amendment incorporates the Eighth Amendment to make its provisions applicable to the state of Alabama.

108.    Defendant Singleton violated 42 U.S.C. § 1983 when he subjected Mr. Smith to unconstitutional cruel and unusual punishment through the use of excessive force while acting under the color of state law.

109.    Correctional officers may only use force "in a good faith effort to maintain or restore discipline." *Skrtich v. Thornton*, 280 F.3d 1295, 1300 (11th Cir. 2002) (quoting *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986)).

18

110.     When a correctional officer causes pain that is unnecessary and wanton, such actions are unconstitutional cruel and unusual punishment. *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

111.     To determine if a correctional officer has used unnecessary and wanton force against a prisoner, the court will look to whether the force was implemented "maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986) (*quoting Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).

112.     Defendant Singleton's physical assault of Mr. Smith was not done in good faith or with any goal of restoring discipline.

113.     Defendant Singleton's physical assault of Mr. Smith was done with malice and with the objective of severely injuring Mr. Smith.

114.     Defendant Singleton, acting individually and under the color of state law, proximately caused Mr. Smith's death by physically beating Mr. Smith—thereby depriving Mr. Smith of his clearly established rights secured by the Eighth and Fourteenth Amendments of the U.S. Constitution in violation of 42 U.S.C. § 1983.

115.     Defendant Singleton's misconduct proximately caused Mr. Smith's wrongful death.

## COUNT TWO
**Violation of the Eighth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983**
**Deliberate Indifference -- Failure to Protect Mr. Smith From The Use of Excessive Force (Against Defendant Waver)**

116.     The Plaintiff adopts and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

117.    Defendant Waver was the Shift Commander at Elmore Correctional Facility on the night Mr. Smith was injured, and he was aware of what happened.  Defendant Waver had actual, personal knowledge of the assaults on Mr. Smith and his resultant injuries because he personally observed the misconduct or was also told about the assaults on Mr. Smith and his resultant injuries.

118.    Defendant Waver was aware that the assaults on Mr. Smith placed Mr. Smith at substantial risk of serious harm because Mr. Smith was being physically beaten, including while he was restrained.  Defendant Waver was also aware of the delay over an extended period of time to seek medical attention for Mr. Smith and failed to intervene or act on Mr. Smith's behalf to obtain medically necessary treatment in a timely fashion.

119.    Defendant Waver knew Defendant Singleton was acting unlawfully by beating Mr. Smith.

120.    Defendant Waver was aware of the history of widespread abuse at Elmore Correctional Facility and, like all ADOC supervisory personnel, he was on notice of the need to correct the ongoing constitutional violations that were rampant at that facility.

121.    Defendant Waver was following and enforcing customs or policies that caused Eighth Amendment violations at Elmore Correctional Facility.  For example, Defendant Waver followed and enforced a custom of permitting unconstitutional beatings of prisoners by guards, including the assault and abuse of Mr. Smith by Defendant Singleton.

122.    Defendant Waver violated 42 U.S.C. §1983 when he subjected Mr. Smith to prison conditions that were so dangerous they resulted in cruel and unusual punishment.

123.    Defendant Waver, like all the Defendants, was aware of the horrific rates of violent assault and homicide at Elmore Correctional Facility.  Correctional officers under

Defendant Waver's supervision participated in the violence and encouraged or failed to prevent violence among the prisoners.

124.    Prisoner-on-prisoner violence and staff-on-prisoner violence were rampant at Elmore Correctional Facility when Mr. Smith was attacked and then died as a result.

125.    Defendant Waver was deliberately indifferent to the unconstitutional deprivation of Mr. Smith's rights because Defendant Waver was aware that Mr. Smith was being beaten and abused through the use of excessive force.

126.    Despite his actual knowledge of these circumstances, Defendant Waver refused to provide help, to order others to provide help, or to assist in any way to prevent or remediate the savage treatment of Mr. Smith by Defendant Singleton and others.

127.    Defendant Waver was deliberately indifferent to the known fact of Elmore Correctional Facility's constant threat of violence to prisoners, including Mr. Smith.

128.    Through his deliberate indifference, including his failure to implement measures to protect prisoners from violence, Defendant Waver subjected Mr. Smith to cruel and unusual punishment violating his Eighth Amendment rights.

129.    Defendant Waver's conduct proximately caused the denial of Mr. Smith's constitutional rights.

### COUNT THREE
**Violation of the Eighth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983**
**Supervisory Liability for Cruel and Unusual Punishment in Light of Unconstitutionally Dangerous Conditions**
**(Against Defendant Dunn, Culliver, Headley, and Waver)**

130.    The Plaintiff adopts and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

131.    Defendants Dunn, Culliver, Headley, and Waver were responsible for confining Mr. Smith safely in a prison where violence and terror reigned.

132.    Defendants Dunn, Culliver, Headley, and Waver were aware of the constant threat of violence to Mr. Smith because of the ongoing horrific conditions at Elmore Correctional Facility.

133.    Rather than acting to mitigate the constant threat of violence, Defendants Dunn, Culliver, Headley, and Waver encouraged or failed to prevent violence by prisoners against other prisoners, and by correctional officers against prisoners, and otherwise utterly failed to implement policies to prevent such atrocities.

134.    Conditions at Elmore Correctional Facility amounted to an environment in which Mr. Smith was subjected to the constant threat of violence.  These conditions included but were not limited to the following:

a.    Prisoners were not properly housed based on their proclivity towards violence.

b.    Correctional officers were not disciplined or removed from the prison population in response to previous acts of violence, use of excessive force, or other indicators that they were unlikely to refrain from violating prisoners' rights.

c.    Elmore Correctional Facility was known to house more prisoners than it could accommodate.

d.    Elmore Correctional Facility was routinely understaffed.

e.    Prison officials and correctional officers failed to keep track of prisoners' whereabouts, nor did they provide for effective monitoring of the conduct of prisoners or of correctional officers by the correctional officers' supervisors.

f.    Prisoners were free to roam freely; doors and locks were either not functioning or were not used properly throughout Elmore Correctional Facility.

g.    Prisoners were armed and either encouraged to use violence or not discouraged from using violence.

h.    Elmore Correctional Facility was not operated in accordance with written policies. To the extent policies nominally existed, they were not followed, and Defendants Dunn, Culliver, Headley, and Waver knew the policies were not followed. Nevertheless, these Defendants failed to enforce the policies, and instead, allowed and encouraged a state of lawlessness to persist at Elmore Correctional Facility.

i.    Prisoners were either not disciplined, or were disciplined in ways that were not provided for underwritten policies, resulting in rampant violations of prisoners' constitutional rights, including the right to be free from the use of excessive force.

j.    Correctional officers were stationed out of earshot or eyesight of prisoners, and supervisors were stationed out of earshot or eyesight of the correctional officers they were supervising.

135.    Defendants Dunn, Culliver, Headley, and Waver either encouraged violence or did not discourage violence at Elmore Correctional Facility by, among other things, failing to take any action to deter correctional officers from using excessive force, and failing to end the custom or policy of encouraging prisoners to use violence against each other or not discouraging prisoners from using violence against each other.

136.    A history of widespread constitutional violations in the form of abuse and assaults at Elmore Correctional Facility -- both by prisoners against other prisoners, and by correctional officers against prisoners -- was known to Defendants Dunn, Culliver, Headley, and Waver.

23

137. Defendants Dunn, Culliver, Headley, and Waver each had the ability to address the widespread constitutional violations at Elmore Correctional Facility, but failed to do so.

138. Defendants Dunn, Culliver, Headley, and Waver knew that the conditions at Elmore Correctional Facility were cruel and unusual, and that the widespread, rampant violence was a threat to the safety of all prisoners, including Mr. Smith. Overcrowding combined with understaffing causes and exacerbates the violence prisoners are subjected to when incarcerated in prisons with such poor conditions.

139. Defendants Dunn, Culliver, Headley, and Waver implemented policies, customs, and conditions at Elmore Correctional Facility that ensured Mr. Smith would be stripped of his ability to protect himself from assaults such as the ones he suffered, and that he would be further stripped of his ability to access aid.

140. Despite their knowledge of exactly how violent the conditions at Elmore Correctional Facility had become, and their knowledge of the need to implement policies and procedures to address the violence there, Defendants Dunn, Culliver, Headley, and Waver failed to implement policies to curb the violence.

141. Defendants Dunn, Culliver, Headley, and Waver followed, and encouraged their subordinates to follow, customs and policies which resulted in deliberate indifference to constitutional rights, such as the right to be free from cruel and unusual punishment.

142. Defendants Dunn, Culliver, Headley, and Waver knew that their subordinates were acting unlawfully or would act unlawfully, but failed to prevent them from doing so. These failures resulted in the violations of prisoners' constitutional rights, including those deprivations of Mr. Smith's constitutional rights which resulted in his death.

143.   There is a causal connection between the actions of Defendants Dunn, Culliver, Headley, and Waver on the one hand, and Mr. Smith's death on the other.

## COUNT FOUR
**Violation of the Eighth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983**
**Deliberate Indifference -- Failure to Address a Known, Serious Medical Need**
**(Against Defendants Waver and Singleton)**

144.   The Plaintiff adopts and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

145.   Mr. Smith had a serious medical need for treatment following the assaults and resultant injuries he was subjected to by Defendant Singleton.

146.   Defendants Singleton and Waver were both aware of Mr. Smith's serious medical need because they were personally aware of the physical beating he had sustained and the resultant, obvious injuries.

147.   Defendants Singleton and Waver acted with deliberate indifference by failing to seek medical attention for Mr. Smith for an extended period of time. In addition to failing to seek medical attention for Mr. Smith, they did not take any steps to warn others that Mr. Smith needed medical attention, or to arrange for Mr. Smith to timely obtain medical attention in any way.

148.   Defendants Singleton and Waver's failure to address Mr. Smith's known, serious medical needs following the assaults and resultant injuries Mr. Smith suffered had a causal connection to Mr. Smith's death.

149.   Mr. Smith's need for medical attention was obvious. He was experiencing bleeding and swelling and the severity of the assaults were personally observed by Defendants Singleton and Waver.

150.    Mr. Smith's need for medical attention was urgent, and it was obvious to Defendants Singleton and Waver that the delay in treating Mr. Smith's injuries would worsen his condition.

151.    Defendants Singleton and Waver had subjective knowledge of the risk of serious harm to Mr. Smith because they were personally aware of the assaults and the injuries Mr. Smith sustained.

152.    Defendants Singleton and Waver disregarded the risk of serious medical harm to Mr. Smith. Defendant Singleton caused the harm by assaulting Mr. Smith; instead of seeking medical attention, Defendant Singleton further assaulted and abused Mr. Smith. Defendant Waver disregarded the risk of serious medical harm to Mr. Smith because, instead of seeking medical attention or ordering others to do the same, Defendant Waver allowed Mr. Smith to languish without medical attention for an extended period of time. Defendant Waver consciously declined to timely intervene in any way to help Mr. Smith or address his need for medical attention.

153.    Defendants Singleton and Waver's conduct was more than grossly negligent because they were aware of a substantial risk of serious harm to Mr. Smith from the beating he was subjected to, but did not take any reasonable measures to alleviate that risk.    Both Defendants Singleton and Waver failed to seek medical attention for Mr. Smith for an extended period of time after they were aware of his injuries

154.    It was evident to both Defendant Singleton and Defendant Waver that a delay in Mr. Smith's treatment would exacerbate the medical problem he was facing following the assaults. There was no justification for the delay of medical treatment, but Defendants Singleton

and Waver nevertheless delayed seeking medical treatment for Mr. Smith for an extended period of time.

155.    As a result of Defendants Singleton and Waver's knowing failures to timely seek necessary medical treatment for Mr. Smith, Mr. Smith suffered injuries up to and including his death.

**COUNT FIVE**
**Ala. Code § 6-5-410**
**Wrongful Death**
**(Against Defendant Singleton)**

156.    The Plaintiff adopts and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

157.    The death of Mr. Smith was the direct and proximate result of Defendant Singleton's intentional assaults on Mr. Smith and his failure to seek necessary medical attention in the face of Mr. Smith's obvious and urgent need for medical treatment.

158.    Defendant Singleton's actions and failures to act proximately caused Mr. Smith's death.

159.    Defendant Singleton's misconduct gives rise to a cause of action by Mr. Smith's personal representative and renders Defendant Singleton liable for punitive damages under Alabama's wrongful death statute, Ala. Code § 6-5-410.

160.    Mr. Smith could have commenced an action for these wrongful acts or failures to act if they had not caused his death.

**PRAYER FOR RELIEF**

WHEREFORE, premises considered, the Plaintiff respectfully prays that this Honorable Court enter an Order:

27

A.  That this Honorable Court enter a judgment in favor of Plaintiff and against Defendants Dunn, Culliver, Headley, Waver, and Singleton under 42 U.S.C. § 1983 and Alabama law;

B.  That damages be awarded to Plaintiff against Defendants in their individual capacities in an amount deemed appropriate by a jury and authorized by law;

C.  That attorneys' fees, expenses, and costs of this action be awarded as authorized by law, including under 42 U.S.C. §§ 1983 and 1988; and

D.  That the Plaintiff be awarded such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands trial by a struck jury.

Dated: November 13, 2019

Respectfully submitted,

Gregory Zarzaur  (ASB-0759-E45Z)
*One of the Attorneys for the Plaintiff*

**OF COUNSEL:**
Anil A. Mujumdar (ASB-2004-L65M)
ZARZAUR
2332 Second Avenue North
Birmingham, Alabama  35203
T: 205.983.7985
F: 888.505.0523
E: gregory@zarzaur.com / anil@zarzaur.com

**PLAINTIFF WILL SERVE THE FOLLOWING DEFENDANTS WITH THE SUMMONS AND COMPLAINT BY PERSONAL PROCESS SERVER:**

Jefferson Dunn
Commissioner, Alabama Department of Corrections
301 South Ripley Street
P.O. Box 301501
Montgomery, Alabama 36130-1501

Grantt Culliver
11977 Wares Ferry Road
Montgomery, Alabama 36117

Joseph Headley
Warden- Staton Correctional Facility
2690 Marion Spillway Road
Elmore, Alabama 36025

Kenny Waver
Elmore Correctional Facility
3520 Marion Spillway Road
Elmore, Alabama 36025

Jeremy A. Singleton
254 Lynwood Drive Apartment B
Montgomery, Alabama 36105